IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| INTERNATIONAL AUTOMATED SYSTEMS, INC.<br><br>    Plaintiff,<br><br><br>    vs.<br><br><br>IBM; IBM CORPORATION; IBM PERSONAL COMPUTING DIVISION; LENOVO (UNITED STATES) INC.; LENOVO GROUP LTD.; UPEK, INC.; and JOHN DOES 1-20<br><br>    Defendants and Counterclaimants. | MEMORANDUM DECISION AND ORDER<br><br><br><br>Case No. 2:06-CV-00072-DB |

## I. INTRODUCTION

On January 28, 1997, after several unsuccessful attempts, the U.S. Patent Office finally granted inventor Neldon Johnson U.S. Patent No. 5,598,474 (the '474 patent) which allowed Johnson to enter the already crowded field of automatic fingerprint identification. Not surprisingly, Johnson's patent described an apparatus capable of reading a fingerprint, identifying its unique features (and their relative positions), and converting that information into a unique code for verification purposes. Equally unsurprising is that Johnson and his company,

International Automated Systems, Inc. (IAS), eventually identified several other players in this crowded field who were potentially infringing upon the '474 patent. In 2006, IAS filed lawsuits against several parties, including UPEK, Inc, alleging infringement of the '474 patent.

This is the last of those lawsuits, and before this Court are five motions: (1) UPEK's Motion for Summary Judgment for Unenforceability under 35 U.S.C. § 285, (2) UPEK's Motion for Attorney's Fees and Costs, (3) IAS's Motion to Dismiss for Lack of Jurisdiction, (4) UPEK's Motion to Strike the Declaration of Craig J. Madson in Support of IAS's Motion in Opposition to UPEK's Motion for Attorney's Fees and Costs, and (5) UPEK's Motion to Strike the Affidavit of Craig J. Madson in Support of IAS's Motion in Opposition to UPEK's Motion for Summary Judgment. This Court held a hearing covering these motions on Friday October 31, 2008. IAS was represented by Ryan J. Marton and Bryan A. Kohm; UPEK was represented by Jeffrey A. Miller, Sugithra Somasekar, and Joseph Barrett. After thorough review and consideration of the briefs submitted by the parties and the oral arguments presented by counsel, the Court enters the following memorandum decision and order.

## II. FACTUAL BACKGROUND

### A. Prosecution History of '474

IAS obtained the '474 patent, directed to an automated biometric identification system, on January 28, 1997. The patent issued from United States Patent Application Serial No. 08/402,014 ('014), which was filed on March 10, 1995. The '014 application was a continuation-in-part application of U.S. Patent Application Serial No. 08/218,743 ('743), which was filed on March 29, 1994. The '743 application in essence claimed a system which could: (1) read the

characteristics from a body part; (2) transfer the characteristics to a camera means; (3) transfer the characteristics from the camera means to a digitizer to produce a digital number; (4) transmit the digital characteristics to a computer; (5) imprint the digital characteristics on a magnetic strip of an identification card. *See Miller Decl.*, Ex. 6, Dkt. No. 118.

The '743 application was rejected by the PTO on two grounds. First, the PTO rejected all of the claims under 35 U.S.C. § 112 as being indefinite for "failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention." *Miller Decl.*, Ex. 7, Dkt. No. 118. Specifically, the PTO found unclear the claims' use of the language "body," "body part," "characteristics," and "magnetic strips." *Id.* Second, the PTO also rejected all of the claims under 35 U.S.C. § 102(b) as being anticipated by U.S. Patent No. 4,811,408 ('408); U.S. Patent No. 4,993,068 ('068); and U.S. Patent No. 4,785,290 ('290). The PTO found that all of the above prior art addressed the storage of biocharacteristic data in a manner similar to the apparatus claimed by the '743 application.

On March 29, 1994, Johnson filed an amendment with the PTO. The amendment made several small changes in the wording of the claims in an attempt to satisfy the PTO. For example, the amendment changed the first step claimed in claim one from "reading the characteristics from a body part with an optical scanning device," to "an optical scanning device for reading the characteristics from a body part to produce an image of the body part characteristics." *Compare Miller Decl.*, Ex. 6, Dkt. No. 118 *with Miller Decl.*, Ex. 9, Dkt. No. 118. The amendment also attempted to differentiate the prior art mentioned by the PTO in its rejection. Johnson highlighted that though some of the prior art taught a process for converting a fingerprint image

into a digital number, only his invention was able to condense this relatively large amount of digital information into a unique number capable of being stored on the magnetic strip of an identification card. Rather than storing the entire image, Johnson's invention was able to convert the image into a smaller data set which in turn could be readily compared to live fingerprint data to ascertain whether the identity stored on the card matched the identity of the card's user.

On December 15, 1994, the PTO rejected Johnson's amended application in full, again for several reasons. First, the PTO found that correction of the drawings was required to reflect the newly-added apparatus so that the "correspondence between the illustrated elements and the claimed elements [is] clear." *Miller Decl.*, Ex. 10, Dkt. No. 118. Second, the PTO again rejected several of the claims under 35 U.S.C. § 102(b) as being anticipated by the '068 patent. In essence, the PTO was unable to distinguish the digital number claimed in the '068 patent, which represented the entire digitized image of the body part, from the digital number claimed in the '743 application, which represented a smaller subset of data culled from the same digitized image. Further, the PTO stated that the claim language did not foreclose the possibility that more than one digital number might be produced from an image, asserting in essence that the number produced might be non-unique. Finally, the PTO also rejected several claims as unpatentable under 35 U.S.C. § 103. The PTO concluded that the use of a "prism" or an "optical scanning device" was obvious to a person having ordinary skill in the art.

Subsequent to the PTO's rejection, Johnson abandoned the '743 application and, on March 10, 1995, attempted to respond to the PTO's concerns in the continuation-in-part '014 application. In the '014 application, Johnson went to great lengths to differentiate the digital

number claimed by the '014 application from the number claimed in the '068 patent.

Specifically, the application stated:

> U.S. Patent No. 4,993,068 does not identify the use of a computer program to find the unique biological identifying parts and separating them from the other parts of the image. It uses the whole biological image to compare it with the live image. This is where the present invention defers[sic]. The present invention deals with first separating and or finding and identifying the unique patterns and identifying marks from the rest of the biological image. It finds only the unique parts of the biometrics image and them identifies them by giving them a unique identification number or code and then combines them into a unique identification code. The unique identification code is composed of a location reference and a biologically unique identifiable mark.

*Miller Decl.*, Ex. 12, Dkt. No. 118.

The '014 application also sought to distinguish other prior art, much of which also involved some form of a "unique code."[1] For example, the application disclosed U.S. Patent No. 4,995,086 ('086), which taught a "characteristic number procedure" by which the data quantity contained in a raw fingerprint image could be reduced to a more manageable size. *Kohm Decl.*, Ex. B, Dkt. No. 159. The procedure taught in the '086 patent analyzed the "quality and sequence" of a "few significant features," such as "unambiguous vortices, arcs, circular arcs, double vortices, crossings and other papillary line forms." *Id.* at col. 3, lns. 10-28. Further, the '086 patent also contemplated several systems by which the features could be coded, *see id.* at col. 3, lns. 29-35, and that one "known recognition system" in particular could detect "approximately 40 features," and used an algorithm based primarily upon "relative positions" to

---

[1] Indeed, it is hard to imagine a useful fingerprint reader that would not involve the generation of a "unique code." The value of a fingerprint lies precisely in its uniqueness. An apparatus capable of deriving a non-unique code from a unique fingerprint would be completely useless.

more effectively reduce the data quantity, *see id.* at col. 5, lns. 65-69, col 6, lns. 1-12.

The '014 application did not, however, disclose U.S. Patent No. 4,325,570 ('570), which taught a fingerprint identification system which also generated a unique code by relying upon the relative locations of certain unique characteristics. Two months before submitting his '014 application, Johnson learned of the '570 patent through a patentability search he conducted in association with a distinct, but substantially similar, patent application. The '570 patent stated:

> A significant part of the present invention involves the generating of an identifier corresponding to the fingerprint 16 such that the identifier can be compared to the fingerprint to determine their correlation. The identifier is made up of a series of alpha, numeric, or alpha-numeric designations or symbols, with each individual designation representing a selected fingerprint characteristic in respective squares of grid 18.

*Miller Decl.*, Ex. 4, Dkt. No. 118, col. 3, lns. 13-20.

The alpha-numeric identifier claimed in the '570 patent and the characteristic number procedure claimed in the '086 patent were quite similar to the methods claimed in the '014 application. The '014 application, however, purported to also teach quality determination and enhancement procedures to set it apart from this prior art.[2] Specifically, the '014 application, in distinguishing the prior art, stated that "[n]one of the above mentioned patents uses any means to determine the quality of the image being read or the quality of the actual biological part. Neither do they provide for a computer program to make enhancements to those images in order to

---

[2] Though the '474 patent was ultimately invalidated by this Court in a companion case because image quality determination and enhancement were not included in the claims, *see Memorandum Opinion and Order*, January 2, 2008, at *32-37, there is substantial evidence that Johnson regarded them as vital components of his invention, *id.* at 32 (noting that IAS admitted that without image quality determination and enhancement, the '474 patent was likely invalid under § 112).

compensate for bad or poor reads and or poor characteristics of the actual biological part." *Miller Decl.*, Ex. 12, Dkt. No. 118. The importance of quality determination and enhancement is repeatedly stated throughout the application. For example, the application also states that "[d]etermining the quality of the scanned image is critical to the process of comparing different biological parts or images of fingerprints," *id.* at col. 7, lns. 35-61, that obtaining an exact read is impossible "without a program that knows how to make the proper enhancements," *id.*, and that process for enhancing images "could be used in all types of biological comparator devices and should improve all of the current patents," *id.* at col. 12, lns. 46-54. The '014 application also included a claim which expressly taught a "means to enhance the fingerprint image through a computer program."

The PTO rejected all of the claims found in the '014 application on October 12, 1995. The PTO found several of the terms of the claims unclear, indefinite, and lacking antecedent basis. In response, Johnson filed at least four more amendments on January 9, 1996, April 2, 1996, June 21, 1996, and July 11, 1996. At some point during the amendment process, Johnson cancelled the claim upon which the enhancement claim depended, unsuccessfully attempted to amend the enhancement claim to make it dependant on other, remaining claims, and ultimately cancelled the enhancement claim. Though is it unclear exactly why the PTO finally relented, it ultimately granted the '474 patent on January 28, 1997.

The claims of the '474 patent as issued are as follows:

1. An apparatus for reading unique identifying characteristics from a body part, transmitting said unique identifying characteristics to a computer, digitizing the characteristics, and then having a computer with the ability to separate out from the whole unique identifying characteristics into separate unique identifying characteristics

and then distinguish and identify the different unique characteristics and then giving each of those unique identifying characteristics a unique code that represents the unique identifying characteristics type and location relative to other unique identifying characteristics for the purpose of affixing them on an identification document, or electronic storage medium including the following components:

> means for transferring the characteristics from a camera means to a digitizer;

> means for transferring the characteristics from the digitizer to the computer for the purpose of separating out from the whole image each unique identifying characteristic;

> means for identifying each unique characteristic by type;

> means for giving each identifying characteristic its own unique code which is comprised of the type and also relative location;

> means for transmitting the unique identification characteristics code to the computer for storage and processing; and

> means for imprinting the unique identification characteristics codes on the electronic storage medium.

2. An apparatus as set forth in claim 1, including the components of:

> means for reading the characteristics from a live impression of a body part;

> means for digitizing the live impression;

> means for transmitting said digital impression to a computer;

> means for separating out from the characteristics its unique identifying characteristics and identifying them by type and position;

> means for comparing in the computer a set of stored unique identification characteristic codes the codes derived from the live digitized impressions of the live body part to establish identity of both the inputs: and

> means for sending a signal to verify the identity of the person evidencing the live impression of the body part.

3. An apparatus as set forth in claim 2, wherein the reading of the characteristics from a live impression of a body part uses a lens that has the capacity to have within itself internal reflection that when a certain type of material touches the outside portion of the lens that at the point of touching the internal reflection is destroyed and an image of where the internal reflection is destroyed is transmitted to a camera.

4. An apparatus as set forth in claim 3, wherein the lens is a prism.
5. An apparatus as set forth in claim 2, wherein said body part is a fingerprint.
6. An apparatus as set forth in claim 2, wherein said body part is a handprint.

7. An apparatus as set forth in claim 2, including printing an impression of the body part on a transactional document.

8. An apparatus as set forth in claim 1, wherein the camera means is a video camera.

9. An apparatus as set forth in claim 1, wherein said body part is a fingerprint.

10. An apparatus as set forth in claim 1, wherein said body part is a handprint.

Though reference to image quality determination and enhancement is completely absent from the claims of the '474 patent, the specification section of the patent contained language drawing attention to the importance of the quality determination and enhancement features.

IAS's failure to include any reference to image quality determination and enhancement in the claims, however, ultimately led this Court to invalidate the '474 patent in IAS's companion case against Digital Persona. *See Memorandum Opinion and Order*, January 2, 2008, Dkt. 79, at 44 ("[T]he claims are invalid under the "regards an invention" requirement because they do not require image quality determination and enhancement, even though that is clearly what [Johnson] regarded as his invention, shown by the specification, a system where it is crucial to use image enhancement in order to identify the unique characteristics and assign a code that can be stored on 100 bytes."). Thus, though the specification was able to successfully distinguish prior art--such as the '068 patent--based upon the notion of quality determination and enhancement, the resulting patent's failure to incorporate that notion in its claims, combined with the specification's failure to teach any system that could function without image determination and enhancement, resulted in the invalidation of the '474 patent.

**B. IAS's Pre-Filing Investigation**

In November of 2005, Johnson claims he became aware of a possible infringement of the '474 patent by the defendants herein when he saw and tested an IBM notebook computer with a fingerprint recognition system. After reviewing information about the product on the

IBM/Lenovo website, Johnson concluded that the system was covered by the '474 patent. Next, Johnson contacted his attorney, J. David Nelson, about the possibility of filing suit against IBM/Lenovo. Prior to commencing suit, in December of 2005, IAS also retained Craig J. Madson, another patent attorney, to perform an infringement analysis regarding the '474 patent, including claim construction analysis.

UPEK asserts that IAS's pre-filing investigation was lacking for two grounds. First, UPEK alleges that IAS's investigation was insufficient because it relied upon a frivolous interpretation of the term "camera means" as including both optical and non-optical fingerprint reading mechanisms. Second, UPEK alleges that IAS had knowledge of, but failed to properly study, prior art that virtually guaranteed that the relevant claims of the '474 patent would be invalidated.

**1. The Construction of "Camera Means"**

A critical aspect of Madson's pre-filing investigation was his assessment of the breadth of the term "camera means" as used in the first element of claim 1 of the '474 patent. A detailed assessment was necessary to determine whether the term also covered fingerprint systems, such as the one developed by UPEK and used by IBM/Lenovo, that do not employ camera-like optical readers. The UPEK system uses "Active Capacitive Sensing" technology which, unlike a camera, is not dependant upon the use of a light source, an aperture, a lens system, and light sensitive material. Rather than measuring light, the UPEK system measures the difference in the capacitance between two capacitor plates to map out the myriad ridges and valleys that comprise a fingerprint.

In the course of several meetings between Nelson and Madson during the two months leading up to IAS's filing of the lawsuit against IBM/Lenovo, Madson expressed his opinion that the "camera means" element of the '474 patent was "not limited to a camera, but includes any suitable replacement/reader." *Madson Decl.*, Dkt. 153, at 4. Madson supported this conclusion by referring to several statements appearing in the specifications section of the '474 patent that implied that the term "camera means" covered a broad array of reading devices. For example, Madson noted that the specifications stated that "the system can use any suitable reader that can render a valid picture of the fingerprint," '474 patent, col. 6, lns. 20-22, that the system "takes the signal from the video camera . . . or suitable replacement, and converts the signal into digital format," *id.*, col. 9, 53-58, and implied that "any device that can convert an image to a picture form can be utilized" by the envisioned system, *id.*, col. 9, lns. 21-24. Based upon this analysis, Madson advised Nelson that it was his belief that the IBM/Lenovo reader fell within the construction of the term "camera means."

By contrast, UPEK's expert witness, Dr. Behnam Bavarian, opined that those in the biometrics field would not consider UPEK's capacitive sensing technology as a camera, without exploring any possible difference between the terms "camera" and "camera means." *Bavarian Decl.*, Dkt. 121, at 2-5. Specifically, Dr. Bavarian noted that rather than generating a light-based photograph, UPEK's readers merely sense the "distance between the finger skin and the top surface of the sensor, e.g., the topography of the surface of the fingerprint."[3] *Id.* Accordingly, he

---

[3] UPEK asserts that IAS could have easily discovered the details of UPEK's system–which were readily available on UPEK's website–had IAS only conducted a Google search for "Lenovo fingerprint security" in May 2006. The relevant time period, however, was several months earlier, before the infringement lawsuits were filed. Further, from Madson's

believed UPEK's readers could not be considered "cameras."

The proper construction of the term "camera means" was also addressed in a *Markman* hearing heard by this Court on November 20, 2007. The defendants at that hearing argued that the term should be construed as requiring a "light sensitive device that receives a visual image and records the image on film or translates the image into electrical impulses." *Defendants'* *Claim Construction Brief*, Dkt. 51, at 36. IAS argued that the term was a "generic term referring to any suitable reader that can read a body part and generate an electronic representation of the body part." *Memorandum Opinion and Order*, Dkt. 79, January 2, 2008, at 7. This Court ultimately found that, although "camera means" is used broadly, it was not so broad as to include non-optical devices. *Id.* at 8.

### 2. The Prior Art References Revealed By IAS's Prosecution of Substantially Similar European and Japanese Patents

UPEK also claims that IAS proceeded to filed several infringement lawsuits even though it had knowledge of prior art which virtually guaranteed all the relevant claims of the '474 would be invalidated. IAS learned of this prior art while prosecuting patents which were substantially similar to the '474 patent before the Japanese Patent Office (JPO) and the European Patent Office (EPO).

On March 8, 1996, IAS filed a patent application with the JPO. Subsequently, on September 7, 1999, the JPO issued an office action rejecting all the claims of the application as being unpatentable over several prior art references. The most important prior art reference relied

---

statements, it appears that even though IAS was not aware of UPEK's role as manufacturer of the IBM/Lenovo readers prior to the filing of the lawsuits, IAS was fully aware of their non-optical nature, and had considered the possible effect of this fact in its pre-filing investigation.

upon by the JPO was a Japanese Published Patent Application by inventor Brendan Costello.

That application described a fingerprint identification apparatus substantially identical to U.S.

Patent No. 4,947,443 ('443), also by Costello. In response to the JPO's initial rejection, Johnson

submitted arguments on March 6, 2000 as to why his invention was patentable over the Costello

prior art. In his response, Johnson states that his invention, unlike the Costello patent, does not

merely compare "unchanged biological parts"; rather, it incorporates an enhancement function

capable of taking the quality of the reading and the amount of moisture in the finger. *Miller*

*Decl.*, Dkt. 122, Ex. 17.

On April 11, 2000, the JPO issued a final rejection of Johnson's Japanese application.

Specifically, it rejected Johnson's argument regarding the Costello patent because the

enhancement function was "not based on the description in the scope of patent claims, and it is

not possible to adopt this." *Miller Decl.*, Dkt. 122, Ex. 18.

On March 8, 1996, Johnson also filed a patent application with the EPO. The EPO

published the application on September 11, 1996 and subsequently issued a search report for the

application, which it published on December 3, 1998. The EPO found several prior art references

"particularly relevant" to the patentability of the Johnson application. *Miller Decl.*, Dkt. 122, Ex.

19. One of those "particularly relevant" prior art references was a PCT publication of an

invention by Costello which was substantially identical to the '443 patent, *see Miller Decl.*, ex.

21. The EPO also found another European patent by Kazue Tanaka "particularly relevant" which

was substantially identical to U.S. Patent No. 4,947,442 ('442).

The EPO issued an examination report on April 27, 2001 in which it rejected all of the

claims of the Johnson EPO application. *Miller Decl.*, Dkt. 122, Ex. 20. The EPO specifically

found that claims 1 and 2 of the Johnson EPO application (which correspond to claims 1 and 2 of

the '474 patent) were not patentable in light of the Costello and Tanaka prior art. Perhaps in light

of his lack of success before the JPO, Johnson did not file a response to this EPO report and

abandoned the application. Johnson, however, continued to view the '474 patent as valid due to

his belief that both of the critical patents revealed during the Japanese and European

prosecutions–the '442 and the '443 patents–were cumulative of the '086 patent which was

disclosed in the '474 patent.

## C. The Procedural History of this Case

IAS initially filed three separate cases with the Federal District for the District of Utah,

each alleging infringement of the '474 patent. First, on January 24, 2006, IAS filed a case against

Digital Persona alleging that the technology used in its peripheral fingerprint reading devices

infringed on IAS's '474 patent. Approximately two weeks later, on February 7, 2006, IAS filed a

second lawsuit against Microsoft Corp.,[4] alleging that its fingerprint reading devices--which

incorporated technology purportedly licensed to Microsoft by Digital Persona–also infringed on

the '474 patent. That same day, IAS also filed a third lawsuit against IBM Corp. and Lenovo

Inc.,[5] alleging that the fingerprint readers integrated into their laptop computers infringed upon

IAS's '474 patent.

---

[4] *International Automated Systems, Inc. v. Microsoft Corp.*, No. 2:06-cv-00114 TC (C.D. Utah).

[5] *International Automated Systems, Inc. v. IBM, IBM Corporation; IBM Personal Computing Division; Lenovo (United States), Inc.; Lenovo Group Ltd.; Upek, Inc. and John Does 1-20*, No. 2:06-cv-00115 BSJ (C.D. Utah).

Not long after the IBM action was filed, IBM and Lenovo made a formal indemnification demand on UPEK, the manufacturer of the allegedly infringing fingerprint readers. In response, on March 28, 2006, UPEK filed a lawsuit in the Northern District of California against IAS seeking a declaratory judgment that the '474 patent was not infringed and was invalid.[6] After UPEK served its complaint on IAS, IAS amended its Complaint in the IBM action in the District of Utah to add UPEK as a defendant. UPEK, IBM, and Lenovo each also submitted motions to stay, dismiss, or transfer IAS's Utah suit to the Northern District of California.

In response, on June 23, 2006, IAS also moved to dismiss, or in the alternative, to stay or transfer UPEK's California declaratory judgment action to the District of Utah. On July 26, 2006, Judge Breyer granted IAS's motion and transferred the UPEK lawsuit to the District of Utah. Later, upon UPEK's motion, this Court consolidated UPEK's transferred declaratory judgment action into the IBM action pending before Judge Jenkins. In the meantime, on August 31, 2006, the Microsoft action was also consolidated with the Digital Persona action by stipulation of the parties.

None of the parties to the two remaining lawsuits, however, subsequently moved to further consolidate them. Presumably, the specific products at issue in each case–peripheral fingerprint readers in the Digital Persona/Microsoft case and integrated laptop fingerprint readers in the UPEK/IBM/Lenovo case–were sufficiently different to preclude ready consolidation.[7]

---

[6] *UPEK v. International Automated Systems, Inc.*, No. 3:06-cv-02237-CRB (N.D. Cal.).

[7] In its arguments before the California court, IAS acknowledged that all three of the cases it brought involving the '474 patent were related, and stated its intent "to coordinate all three cases before a single judge in that district after all defendants have appeared." IAS Motion to Dismiss, at 2. This initial desire to coordinate all three cases seems to have waned as the

UPEK itself acknowledged the difficulty of further consolidating the two remaining lawsuits in the briefs it submitted to both the Northern District of California and the District of Utah while the dueling motions to dismiss, stay, or transfer were both pending in those courts.[8]

Judge Jenkins set a schedule in the consolidated UPEK action which, after subsequent stipulated amendment, called for all discovery to be completed by February 13, 2008. Before engaging in substantial discovery, UPEK informed IAS of its belief that the suit was baseless, and offered to bear its own costs if IAS immediately moved to dismiss the case with prejudice. Letter from Jeffrey A. Miller to Darryl Woo, Aug. 15, 2007, *Miller Decl.*, Dkt. 150, Ex. 2. UPEK also informed IAS of its intention to seek its attorneys' fees and costs if IAS did not dismiss the case. *Id.*  Despite several attempts, the parties were unable to reach a settlement.

On November 20, 2007, while the consolidated UPEK action was heading towards trial, this Court conducted a claim construction hearing and entertained the defendants' summary judgment motion in the consolidated Digital Persona lawsuit. On January 3, 2008, this Court entered summary judgment for Digital Persona and Microsoft and issued an order invalidating all the claims of the '474 patent for failing to satisfy various requirements of 35 U.S.C. § 112.

litigation took shape.

[8] Before the California Court, UPEK argued that "the products made by Digital Persona and incorporated into Microsoft's products dramatically differ from the products made by UPEK and incorporated into Lenovo's PCs. *UPEK Opp. to Defendant's Motion to Dismiss, Stay or Transfer*, at 10. Subsequently, before the Utah Court, UPEK similarly argued that "the products sold by Digital Persona and Microsoft are dramatically different than those sold by UPEK and built into Lenovo's PCs. Infringement proofs will be different and maintaining the three actions in a single proceeding would only have invited confusion." *Memorandum in Support of Defendant UPEK's Motion to Stay, or in the Alternative, Dismiss, or Sever UPEK and Transfer Venue or Stay Litigation Involving Lenovo and IBM*, at 6, Dkt. 17, Case No. 2:06-cv-00115.

Subsequently, on January 9, 2008, Judge Jenkins sua sponte issued an order consolidating the consolidated UPEK action into the consolidated Digital Persona action.[9]

Shortly thereafter, IAS appealed this Court's invalidation of the '474 patent to the Court of Appeals for the Federal Circuit. On April 8, 2008, the Federal Circuit dismissed IAS's appeal because final judgment had not yet been entered on any of the noninfringment counterclaims or any of the claims or counterclaims in the suits between IAS and UPEK, IBM, and Lenovo. *International Automated Systems, Inc. v. Digital Persona, Inc.*, 2:06-cv-72, at 2 (Apr. 8, 2008). Thereafter, both Digital Persona and Microsoft stipulated with IAS to dismiss all claims between the parties.

On June 2, 2008, IAS offered to also settle and dismiss its case against UPEK with no payment by UPEK. Three weeks later, UPEK instead opted to file the present motion for summary judgment and motion for attorney's fees. In response, on August 7, 2008, IAS granted UPEK a covenant not to sue and filed the present motion to dismiss for lack of subject matter jurisdiction. Finally, on September 15, 2008, UPEK filed two additional motions to strike declarations submitted by IAS during the course of briefing the summary judgment and attorney's fees motions.

---

[9] Judge Jenkins noted that the '474 patent had been the subject of "at least four lawsuits filed in [the Federal District Court for the District of Utah]," and that the Plaintiffs failed to indicate any pending related cases on the Cover Sheet. *Order*, January 9, 2008, Dkt. 80, at 1 (noting that "[f]or whatever reason, cases with a common prior legal question were not brought to the attention of the court so that common questions could be dealt with by one decision-maker").

## III. DISCUSSION

**A. Jurisdiction of the District Court to Hear UPEK's Counterclaim**

UPEK seeks summary judgment on its counterclaim that the '474 patent is unenforceable due to Neldon Johnson's inequitable conduct. This Court may only entertain UPEK's declaratory judgment counterclaim if there is an "actual controversy" between "interested" parties. 28 U.S.C. § 2201(a); *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1340 (Fed. Cir. 2001). Recently, the Supreme Court decided *MedImmune, Inc. v. Genentech, Inc.*, in which the Court rejected the Federal Circuit's "reasonable apprehension of imminent suit" test for determining declaratory judgment jurisdiction. 549 U.S. 118, 132 n.11 (2007). Instead, the *MedImmune* court held that the key question in determining jurisdiction is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). In *SanDisk Corp. v. STMicroelectronics NV*, 480 F.3d 1372 (Fed. Cir. 2007), the Federal Circuit applied *MedImmune* in the context of suits to determine patent rights. The Federal Circuit held that,

> where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights.

*Id.* at 1381.

The burden of proving that a substantial and immediate controversy exists rests squarely

on the declaratory judgment plaintiff. *Benitec Australia, Ltd. v. Nucleonics,Inc.*, 495 F.3d 1340, 1345 (Fed. Cir. 2007). Specifically, the party seeking declaratory relief must "establish that such jurisdiction existed at the time the claim for declaratory relief was filed and that it has continued since. *Id.* (citing *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974) ("The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint [was] filed.").

In *Benitec*, the Federal Circuit reaffirmed that a patentee's grant of a covenant not to sue divests a court of jurisdiction over a declaratory judgment plaintiff's claims. 495 F.3d at 1346. *Benitec* in essence reaffirmed several pre-*MedImmune* decisions–decided under the "reasonable apprehension of imminent suit" test–which had all reached the same result. *See, e.g.*, *Intellectual Property Development, Inc. v. TEI Cablevision of California, Inc.*, 248 F.3d 1333 (Fed. Cir. 2001); *Super Sack Manufacturing Corp v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed. Cir. 1995); *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 855 (Fed. Cir. 1999).

Certain procedural postures, however, require a court to retain jurisdiction over a declaratory judgment plaintiff's claim even if at first blush it may appear that the precedent suggests otherwise. For example, in *Fort James Corp. v. Solo Cup Co.*, the Federal Circuit reversed the district court's holding that it did not have jurisdiction to hear a declaratory judgment counterclaim of patent invalidity. 412 F.3d 1340, 1349 (Fed. Cir. 2005). In *Fort James*, the patentee granted Solo Cup, the alleged infringer, a covenant not to sue *after* a jury had returned a verdict finding that the patent at issue "was not invalid and that Solo Cup did not infringe any of the patents in suit." *Id.* at 1345. Given this "unique procedural posture," the

Federal Circuit concluded that a literal application of *Super Sack* was not appropriate. *Id.* at 1348. Rather, the *Fort James* court applied the now outmoded reasonable apprehension of suit test to distinguish *Super Sack*, *Intellectual Prop. Dev.*, and *Amana Refrigeration, Inc. Id.*

  The court stated that the covenant granted by Fort James had no effect on Solo Cup's reasonable apprehension of liability because, by the time the covenant was granted, Fort James's claim for infringement had already been resolved by the jury. *Id.* Fort James effectively lost its ability to divest the district court of jurisdiction by waiting until after the decision on its infringement claims had been reached. The *Fort James* court further noted that this result is supported by Supreme Court cases allowing jurisdiction over declaratory judgments of invalidity after findings of noninfringement had already been entered. *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95 (1993) ("It is equally clear that the Federal Circuit, even after affirming the finding of non-infringement, had jurisdiction to consider Morton's appeal from the declaratory judgment of invalidity."); *Altvater v. Freeman*, 319 U.S. 359, 364 (1943).

  In *Benitec*, the Federal Circuit offered its first post-*MedImmune* reading of *Fort James*. The *Benitec* court sided with *Super Sack* and its progeny and refused to uphold jurisdiction, focusing on the fact that *Benitec* requested dismissal "before a trial [of the infringement issue] and the considerable effort connected therewith had taken place." 495 F.3d 1340, 1347 (Fed. Cir. 2007). Rather, Benitec sought to dismiss its infringement claim after the Supreme Court issued an opinion in *Merck KgaA v. Integra Lifescience I, Ltd.*, 545 U.S. 193 (2005), which undermined the viability of Benitec's infringement claims. *See Benitec*, 495 F.3d at 1347-48 ("Benitec made its covenant and sought dismissal of its infringement claim after it concluded that the *Merck*

decision precluded an infringement claim.").

In sum, both *Benitec* and *Fort James* involved plaintiffs subsequently precluded from pursuing their original infringement claims. In *Fort James*, continuing jurisdiction was deemed proper because the infringement claims had been fully litigated and decided by the time the plaintiffs decided to grant the defendants a covenant not to sue. By contrast, in *Benitec*, though the plaintiffs were perhaps similarly foreclosed from succeeding on their infringement claims by the *Merck* decision, continuing jurisdiction was deemed lacking because no trial of Benitec's infringement claims had taken place.

In the present case, UPEK understandably seeks to fit itself within the narrow *Fort James* exception. Unlike *Fort James*, however, the substance of IAS's infringement claims have not yet been resolved on the merits. The parties never completed fact discovery, only conducted five fact depositions, and never reached the expert discovery stage. Furthermore, neither party has filed for summary judgment on the merits of IAS's infringement claims, and no trial has been held.

This court's invalidation of the '474 patent on January 3, 2008 in the Digital Persona case cannot serve as a proxy for a resolution of IAS's infringement claims against UPEK. As UPEK itself noted, the infringement claims IAS brought against UPEK and IBM/Lenovo regarding fingerprint readers integrated into laptops are distinct from the claims IAS brought against Digital Persona. UPEK explicitly argued before Judge Jenkins that "the products sold by Digital Persona and Microsoft are dramatically different than those sold by UPEK and built into Lenovo's PCs," that the infringement proofs would be different in each case, and that intertwining them would "invite[] confusion." Memorandum in Support of Defendant UPEK's

Motion to Stay, or in the Alternative, Dismiss, or Sever Upek and Transfer Venue or Stay Litigation Involving Lenovo and IBM, at 6. The fact that Judge Jenkins consolidated the UPEK action into the Digital Persona action six days after this Court invalidated the '474 patent did not render IAS's infringement claim against UPEK fully litigated and decided.

Further, this Court's January 3 Order did not even address IAS's infringement claims in the consolidated Digital Persona lawsuit. Rather, the January 3 Order construed the claims of the '474 patent and granted a motion for summary judgment brought by Digital Persona under 35 U.S.C. § 112. The effect of this order was to render any claims for infringement of the '474 patent moot. The effect was certainly not to render such claims fully litigated and decided such that UPEK might take advantage of the limited exception enunciated in *Fort James*.

As a result, this Court no longer has jurisdiction over UPEK's claims under 35 U.S.C. § 285 that the '474 patent is unenforceable due to Johnson's inequitable conduct. Accordingly, IAS's Motion to Dismiss for Lack of Jurisdiction is GRANTED and UPEK's Motion for Summary Judgment for Unenforceability under 35 U.S.C. § 285 is MOOT.

**B. UPEK's Motions to Strike Craig J. Madson's Declaration and Affidavit**

UPEK filed two motions to strike statements made by Craig J. Madson, one of which was made in opposition to UPEK's motion for attorney's fees and one of which was made in opposition to UPEK's motion for summary judgment under 35 U.S.C. § 285. Even though this Court has already denied UPEK's motion for summary judgment on jurisdictional grounds, it is still necessary to decide both motions because evidence of inequitable conduct is relevant to

UPEK's motion for attorney's fees.[10]

UPEK's first motion to strike turns on the question of whether IAS's non-disclosure of Madson's role in performing IAS's pre-filing investigation was justified under the attorney-client privilege or work-product doctrines. The motion is directed at the statements made by Madson in support of IAS's opposition to UPEK's motion for attorney's fees and costs. *Madson Decl. I*, Dkt. 153. In his first declaration, Madson states that he was retained in December 2005 as a consulting expert to perform an infringement analysis regarding the '474 patent. It further states that Madson met several times with IAS's attorneys to discuss whether the term "camera means" covered non-optical fingerprint readers. Madson concluded that "a reasonable construction of 'camera means' included both optical and non-optical readers." *Id.*

UPEK seeks to strike Madson's first declaration on the grounds that IAS's failed to identify Madson's role in IAS's pre-filing investigation. Specifically, IAS failed to mention Madson in their initial disclosures and interrogatory responses, and failed to produce any documents during discovery related to Madson's pre-filing investigation. Interrogatory No. 10 asked IAS to,

> Identify each pre-lawsuit investigation conducted by or on behalf of [IAS] prior to the commencement of this lawsuit to investigate UPEK's, IBM's and/or Lenovo's alleged infringement of [the '474 patent], including the identity of each claim in the ['474 patent] evaluated for infringement prior to commencement of this lawsuit, each product that was compared with that claim prior to commencement

---

[10] *See Monsanto Co. v. Bayer Bioscience N.V.*, 514 F.3d 1229, 1242 (Fed. Cir. 2008) ("While the covenant [not to sue for infringement] may have eliminated the case or controversy pled in the patent-related counterclaims and deprived the district court of Article III jurisdiction with respect to those counterclaims, the covenant does not deprive the district court of jurisdiction to determine the disposition of . . . the request for attorney fees under 35 U.S.C. § 285." (citing *Highway Equip. Co. v. FECO, Ltd.*, 469 F.3d 1027, 1033 n.1 (Fed. Cir. 2006))).

> of this lawsuit, whiether it was determined that the product infringed that claim
> prior to the commencement of this action, and where, when, how and by whom
> the pre-suit investigation was conducted and the infringement determination
> made, and all facts, documents, thigs and knowledgeable persons that supported
> that infringement determination that were known to [IAS] or their counsel prior to
> the commencement of this action.

*Barrett Decl.*, Dkt. 172, Ex. C.

In response, IAS made its boilerplate objection based upon the attorney-client privilege

and the work product doctrine, incorporated its response to Interrogatories Nos. 6 and 7, and

reiterated that "[a]ny further information is protected by the attorney-client privilege and/or

attorney work product doctrine." *Barrett Decl.*, Dkt. 172, Ex. C. Interrogatory No. 6 asked how

and on what date IAS first became aware of the infringing products, to which IAS answered,

> IAS first became aware of UPEK when UPEK served its complaint for
> declaratory judgment on IAS in approximately late March, 2006. IAS first
> became aware that IBM and/or Lenovo were distributing products containing
> fingerprint authentication systems in approximately November, 2005. Neldon
> Johnson . . . saw an IBM notebook computer with a built-in fingerprint
> recognition system. Randy Johnson then searched the Internet and located the
> IBM/Lenovo website where information regarding the IBM/Lenovo notebook
> computers was advertised and where further information regarding the security
> feature using the built-in fingerprint recognition system was presented.

*Barrett Decl.*, Dkt. 172, Ex. C.

Interrogatory No. 7 asked IAS to identify "any person who has conducted any inspection,

testing, evaluation or analysis of any UPEK product or process" and to provide the "date, nature

and results of such activity." IAS responded as follows:

> In approximately November of 2005, Neldon Johnson saw an IBM notebook
> computer with a built-in fingerprint recognition system and reviewed information
> on IBM/Lenovo's website regarding the fingerprint recognition system utilized by
> IBM/Lenovo. He concluded that the system was covered by the patent-in-suit. It
> appeared to Neldon Johnson that the IBM/Lenovo fingerprint recognition system,

-24-

like the patented system he invented, utilized certain fingerprint features or characteristics for matching and not a gross fingerprint image. He concluded that the IBM/Lenovo Notebook computers with the built-in fingerprint recognition system appeared to contain all of the elements of Claim 1 of the patent-in-suit and therefore concluded that the IBM/Lenovo computers with the built-in fingerprint recognition system infringed the patent-in-suit.

*Barrett Decl.*, Dkt. 172, Ex. C.

Given these facts, neither the attorney-client or the work-product privilege excuses IAS's non-disclosure of the fact that attorneys Madson and Nelson performed its pre-filing investigation. Especially given the history that had developed between UPEK and IAS which included a letter sent by UPEK to IAS after this lawsuit was filed informing IAS that UPEK considered the case to be improperly brought and that UPEK intended to seek its attorneys' fees, IAS was clearly on notice that the adequacy of a pre-filing investigation may be at issue. The discovery discussed above clearly inquired into such pre-filing issues. IAS should have at least disclosed the fact that attorneys were consulted, rather than simply refer to the investigation performed by Johnson and his son Randy. This becomes all the more clear in light of the haste with which IAS produced Madson's declaration for precisely that purpose (to prove that it had in fact conducted an adequate pre-filing investigation) when facing UPEK's motion for attorney's fees.

Under these circumstances, IAS was obligated under Rule 26(a) of the Federal Rules of Civil Procedure to disclose its consultations with Madson and Nelson before it filed suit against UPEK.

Even though IAS was obligated to disclose the fact that an attorney played a significant role in its pre-filing investigation pursuant to Rule 26(e) of the Federal Rules of Civil Procedure,

it might still escape the harsh sanction of exclusion set out in Rule 37 of the Federal Rules of

Civil Procedure if its non-disclosure was either substantially justified or harmless. Fed. R. Civ.

P. 37. Rule 37, however, also states that "in addition or instead of [exclusion], the court, on

motion and after giving an opportunity to be heard: (A) may order payment of the reasonable

expenses, including attorney's fees, caused by the failure." *Id.*

      As discussed above, IAS's non-disclosure of Nelson and Madson's role in the pre-filing

investigation was not justified under either the attorney-client privilege or the work-product

doctrine. However, IAS's non-disclosure may nevertheless be harmless. The following factors

serve to guide the district court in determining harmlessness: "(1) the prejudice or surprise to the

party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3)

the extent to which introducing such testimony would disrupt the trial; and (4) the moving

party's bad faith or willfulness." *Jacobsen v. Deseret Book* Co., 287 F.3d 936, 954 (10th Cir.

2002) (quoting *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993

(10th Cir. 1999).

      After weighing the four factors, this Court finds that the non-disclosure was not harmless.

With respect to the first factor, a simple glance at the chronology of the present case clearly

demonstrates that IAS's non-disclosure both prejudiced and surprised UPEK. Prior to filing its

motion for attorney fees and costs, UPEK relied upon IAS's interrogatory responses in

determining the scope of IAS's pre-filing investigation, information that lies at the very heart of

its motion for attorney fees under 35 U.S.C. § 285. As regards the second factor, there was

nothing practical UPEK could have done prior to filing its motion for attorney fees to cure the

prejudice. Indeed, had IAS disclosed the fact that attorneys played a substantial role in IAS's

pre-filing investigation, UPEK may well have decided not to file a motion for attorney fees in the

first place. The third factor is not applicable, as no trial on IAS's motion for attorney fees is set

to take place. Finally, the fourth factor is not dispositive because, even if we assume IAS acted in

good faith, good faith alone does not cure the prejudicial effect on UPEK of the non-disclosure.

*See Jacobsen*, 287 F.3d at 954.

Having determined that IAS should have disclosed the Madson and Nelson information

earlier, and finding that failure to do so was neither justified nor harmless, we turn to Rule 37 for

an appropriate sanction. The Rule first allows the Court to prohibit any use of the untimely

disclosed information. This is what UPEK requests in its motion to strike. Rule 37 also allows

the Court to consider allowing the information to be used by the offending party while requiring

the offender to pay "reasonable expenses, including attorney's fees, caused by the failure." Fed.

R. Civ. Pro. 37(c)(1). The Court finds the latter sanction appropriate in this case. Accordingly,

UPEK's motion to strike is DENIED. IAS is allowed to use the Madson declaration in support of

the adequacy of its pre-filing investigation, but IAS is required to pay UPEK for its reasonable

costs and attorney's fees in connection with UPEK's filing of it's motion for attorney's fees and

its motion to strike Madson's first declaration.

UPEK's second motion to strike requires an assessment of whether Madson can properly

be considered an expert for the purpose of determining whether the '570 patent is cumulative to

the '086 patent. *Madson Decl. II*, Dkt. 159. UPEK claims that Madson does not meet the

requirements of Fed. R. Evid. 702. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. To qualify as an expert, a person must possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (quoting *Graham v. Wyeth Labs.*, 906 F.2d 1399, 1408 (10th Cir. 1990)).

Expert testimony on issues of law, however, is generally inadmissible. *See Estate of Sowell v. United States*, 198 F.3d 169, 171-72 (5th Cir. 1999); *United States v. Simpson*, 7 F.3d 186, 188 (10th Cir. 1993); *Estes v. Moore*, 993 F.2d 161, 163 (8th Cir. 1993); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *United States v. Jungles*, 903 F.2d 468, 477 (7th Cir. 1990). Indeed, "[a]n expert's opinion on the ultimate legal conclusion is neither required nor indeed 'evidence' at all." *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1574 (Fed. Cir. 1993) (quoting *Nutrition 21 v. United States*, 930 F.2d 867, 871 n.2 (Fed. Cir. 1991)).

In *Markman v. Westview*, the Federal Circuit expressly held that claim construction is a matter of law. 52 F.3d 967, 979 (Fed. Cir. 1995). In *Markman*, the court found that the testimony of a "patent attorney on the proper construction of the claims is entitled to no deference." *Id.* at 983. Subsequently, the Federal Circuit noted that it has "on numerous occasions noted the impropriety of patent lawyers testifying as expert witnesses and giving their opinion regarding the proper interpretation of a claim as a matter of law." *Endress + Hauser, Inc. v. Hawk*

*Measurement Systems Pty. Ltd.*, 122 F.3d 1040, 1042 (Fed. Cir. 1997). The question of whether a particular patent is cumulative to another must similarly be an issue of law, as it requires the claims of two patents to be construed and compared. *See e.g.*, *Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.*, 1995 WL 261407, at *7 (N.D.Cal. April 25, 2005) (preventing a patent attorney from testifying as to what the prior art teaches because he was not a technical expert).

UPEK's second motion to strike concerns the statements made by Madson is support of IAS's opposition to UPEK's motion for summary judgment. *Madson Decl. II*, Dkt. 159. Madson's second declaration addresses the materiality of the '570 patent to Johnson's '014 application. It concludes that the '570 patent is cumulative to the '086 patent which was disclosed to the PTO by Johnson in his '014 application. Madson's opinion, however, is itself cumulative of other parts of the record that contain the same arguments regarding the teachings of the '570 and '086 patents, and the differences between systems based upon Cartesian coordinates and those based upon relative location.

In its second motion to strike, UPEK argues that Madson's bachelor's degree in mathematics does not qualify him as an expert regarding the differences between the '570 and '086 patent. Indeed, there is no evidence that Madson has any specialized knowledge in biometrics, that he studied biometrics, took any graduate level courses, or ever worked in the biometrics industry. Madson's declaration does not rest on a substantial foundation and is therefore unhelpful to this Court. Accordingly, UPEK's motion to strike Madson's declaration in opposition to UPEK's motion for summary judgment under 35 U.S.C. § 285 is GRANTED.

However, because the legal arguments contained in Madson's second declaration were already before the Court, striking his second declaration has little effect on the outcome of UPEK's motion for attorney's fees.

## C. UPEK's Motion for Attorney Fees

Title 35 U.S.C. § 285 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." IAS's covenant not to sue UPEK does not deprive this Court of jurisdiction to determine attorney fees under 35 U.S.C. § 285. *See Monsanto Co. v. Bayer Bioscience N.V.*, 514 F.3d 1229, 1242 (Fed. Cir. 2008) ("While the covenant [not to sue for infringement] may have eliminated the case or controversy pled in the patent-related counterclaims and deprived the district court of Article III jurisdiction with respect to those counterclaims, the covenant does not deprive the district court of jurisdiction to determine the disposition of . . . the request for attorney fees under 35 U.S.C. § 285." (citing *Highway Equip. Co. v. FECO, Ltd.*, 469 F.3d 1027, 1033 n.1 (Fed. Cir. 2006))).

"A case may be deemed exceptional when there has been some material inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed. R. Civ. R. 11, or like infractions." *Brooks Furniture Mfg., Inc. v. Dutailier Intern., Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005).[11] Additionally, the Court may

---

[11] Thus, although the Court no longer has jurisdiction over UPEK's motion for summary judgment based upon inequitable conduct, it still must consider inequitable conduct in determining UPEK's motion for attorney fees under 35 U.S.C. § 285. *See, e.g.*, *Monsanto*, 514 at 1242 (Fed. Cir. 2008) ("[T]he district court's jurisdiction to rule on attorney fees encompassed the jurisdiction to make findings of inequitable conduct regarding all four patents."); *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1380 (Fed. Cir. 1999) (holding that the district

consider "the closeness of the case, the tactics of counsel, the conduct of the parties, and any other factors that may contribute to a fair allocation of the burden of litigation as between winner and loser." *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986). Despite this list of triggering factors, the Federal Circuit has cautioned that "it is not contemplated that the recovery of attorney's fees will become an ordinary thing in patent suits." *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1329 (Fed. Cir. 2003). Rather, "[i]n the context of fee awards to prevailing accused infringers, . . . § 285 is limited to circumstances in which it is necessary to prevent 'a gross injustice' to the accused infringer." *Id.* (quoting *Mach. Corp. of Am. v. Gullfiber AB*, 774 F.2d 467, 472 (Fed. Cir. 1985). Accordingly, the burden is on the party seeking attorney fees to prove an exceptional case by clear and convincing evidence. *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1327 (Fed. Cir. 2003).

In the present case, UPEK relies heavily upon the inadequacy of IAS's pre-filing investigation in making its motion for attorney's fees under § 285. It is therefore necessary to examine more closely the differences between the Rule 11 and § 285 standards for pre-filing investigations. As noted above, a case may be deemed exceptional because the plaintiff was unjustified in bringing it, violated Rule 11, or committed other similar infractions. As a result, the adequacy of the plaintiff's pre-filing preparation is certainly "relevant to the 'exceptional' case question." *Epcon Gas Systems, Inc. v. Bauer Compressors, Inc*., 279 F.3d 1022, 1035 (Fed. Cir. 2002).

_____

court "erred in not making an inequitable conduct determination prior to ruling on the exceptional case issue"); *A.B. Chance Co. v. RTE Corp.*, 854 F.2d 1307, 1312 (Fed. Cir. 1988) ("[T]he district court erred when it did not make a determination of whether or not Chance had engaged in inequitable conduct before the PTO [in denying the request for attorney fees].").

Merely showing that a "non-ideal" pre-filing investigation was performed, however, is not enough to justify an award of under § 285; rather, the conduct must rise "to the level of bad faith litigation or gross negligence." *Q-Pharma, Inc. v. Andrew Jergens Corp.*, 360 F.3d 1295, 1298 (Fed. Cir. 2004) (affirming the district court's finding of non-exceptionality). Section 285 motions based upon the inadequacy of a pre-filing investigation are therefore critically different from Rule 11 motions based upon the same underlying conduct. Rule 11 only requires "an inquiry reasonable under the circumstances," Fed. R. Civ. P. 11(b); Section 285, on the other hand, requires clear and convincing evidence of "studied ignorance." *Eltech Systems Corp. v. PPG Industries, Inc.*, 903 F.2d 805, 810 (Fed. Cir. 1990); *see also Digeo, Inc. v. Audible, Inc.*, 505 F.3d 1362, 1369 (Fed. Cir. 2007) (highlighting the differences between Rule 11 and § 285 and noting that "merely negligent conduct does not suffice to establish that a case is exceptional"); *Ultra-Temp Corp. v. Advanced Vacuum Systems, Inc.*, 189 F.R.D. 17, 21 (D. Mass. 1999) ("[U]nlike Rule 11, a failure to conduct an adequate investigation, without more, is not grounds for finding a case to be 'exceptional' under 35 U.S.C. § 285").

A heightened standard is appropriate for § 285. Unlike Rule 11, the party requesting fees under § 285 need not provide its opponent any advance written notice that it will seek fees or an opportunity to withdraw the challenged pleading. Fed. R. Civ. P. 11(c)(2). Further, unlike a Rule 11 case, the burden remains with the movant even after a non-frivolous allegation has been made. *Digeo, Inc. v. Audible, Inc.*, 505 F.3d 1362, 1368 (Fed. Cir. 2007). Accordingly, parties who run afoul of specific pre-filing investigation requirements set out in Rule 11 cases[12] do not

---

[12] For cases involving pre-filing requirements under Rule 11, see, for example, *Intamin, Ltd. v. Magnetar Tech., Corp.*, 483 F.3d 1328, 1338 (Fed. Cir. 2007); *Hoffmann-La Roche Inc. v.*

necessarily simultaneously rule afoul of § 285. In *Digeo*, the Federal Circuit made clear that to benefit from the more lenient Rule 11 standard, a party must bring a successful Rule 11 motion prior to moving for attorney's fees under § 285. *Id.* at 1367.

Several of the exceptional case factors are arguably present in this case. First, UPEK alleges that IAS's non-disclosure of the '570 patent amounts to inequitable conduct before the PTO. Second, UPEK alleges that IAS was unjustified in bringing this lawsuit in light of its prior failure to obtain patents from the Japanese and European patent offices. Finally, UPEK alleges that IAS's pre-filing investigation was wholly inadequate because IAS failed to reasonably research UPEK's products, because IAS's attorneys were not sufficiently involved in the investigation, and because Madson failed to reasonably construe the term "camera means."

Regarding the allegation of inequitable conduct, this Court finds that IAS's actions in not disclosing the '570 patent do not amount to clear and convincing evidence proving an exceptional case. IAS failed to disclose a patent that disclosed a "unique number"-type procedure very similar to the procedure claimed in the '474 patent. The inequitable nature of that non-disclosure, however, hinges on the closer questions of whether the '570 patent is cumulative of the '086 patent which Johnson did disclose to the PTO, and, to the extent that it is not, whether any remaining differences between the '570 and the '086 would have been material to the PTO in evaluating Johnson's many patent applications and amendments. The closeness of these questions prevents this evidence of inequitable conduct from elevating the present case's

---

*Invamed Inc.*, 213 F.3d 1359, 1364 (Fed. Cir. 2000); *Judin v. United States*, 110 F.3d 780, 784-85 (Fed. Cir. 1997); *Cambridge Prods., Ltd. v. Penn Nutrients, Inc.*, 962 F.2d 1048, 1050 (Fed. Cir. 1992).

status to exceptional under 35 U.S.C. § 285.

Evidence of IAS's failed Japanese and European patent applications is similarly insufficient to serve as clear and convincing evidence that this case is exceptional. The fact that the JPO rejected a patent application substantially similar to the '474 patent on the grounds that it was anticipated by another U.S. patent and that it failed to claim quality determination and enhancement certainly should have given IAS pause in bringing several of it's lawsuits. This evidence alone, however, does not make IAS's filing frivolous or unjustified. Patents issued by the PTO enjoy a presumption of validity, *see* 35 U.S.C. § 282, and patentees need not submit any evidence as to the validity of their patents before initiating an infringement action, *see Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1562 (Fed. Cir. 1988). Thus, the Japanese and European patent offices' decisions did not foreclose IAS's right to sue for infringement of the '474 patent in the United States.

Finally, IAS's pre-filing investigation was not so insufficient as to meet the heightened standard under § 285. Several aspects of IAS's pre-filing investigation can certainly be considered "non-ideal": (1) the fact that Johnson and his son Randy appear to have substantially performed the investigation without the assistance of an attorney; (2) the fact that IAS's claim chart provided by Madson makes no mention of the quality determination and enhancement procedures that IAS seems to have thought were so critical to the '474 patent during its prosecution; and (3) the fact that IAS's and Madson's construction of the term "camera means" bordered on frivolous and was ultimately rejected by this Court. Even though these facts may possibly have supported a successful Rule 11 motion, they do not rise "to the level of bad faith

litigation or gross negligence" required to warrant "exceptional" status under § 285. Accordingly, UPEK's motion for attorney's fees under § 285 is denied.

In sum, for the reasons stated above, IAS's Motion to Dismiss for Lack of Jurisdiction is GRANTED; UPEK's Motion for Summary Judgment for Unenforceability under 35 U.S.C. § 285 is MOOT; UPEK's motion to strike Madson's declaration in opposition to UPEK's motion for attorney's fees is DENIED; UPEK's motion to strike Madson's declaration in opposition to UPEK's motion for summary judgment under 35 U.S.C. § 285 is GRANTED; and UPEK's motion for attorney's fees under § 285 is DENIED. Finally, although UPEK's motion to strike Madson's declaration in opposition to UPEK's motion for attorney's fees is DENIED; for the reasons stated above, IAS is required to pay UPEK for the reasonable costs and attorney's fees UPEK incurred in connection with UPEK's filing of it's motion for attorney's fees and its motion to strike Madson's first declaration.

Dated this 12th day of January, 2009

_____
Dee Benson
United States District Court